PEOPLE v. BROOKLYN COOPERAGE CO. et al.

(Supreme Court, Special Term, Albany County. June, 1910.)

1. JUDGMENT (§ 252*)—PLEADINGS—AFFIRMATIVE RELIEF TO DEFENDANT.

No affirmative relief could be granted a defendant against another defendant, where it was not asked in the answer.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 441, 442; Dec. Dig. § 252.*]

2. STATES (§ 102*)—PROPERTY—CONTRACTS OF SALE—RATIFICATION.

The fact that the state, after learning of the existence of an unauthorized contract between Cornell University and a private corporation for the sale to the latter of the timber growing on the forest preserve of the State College of Forestry, which tended to defeat the legislative purpose in establishing the forestry college, made appropriations for its

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

maintenance, did not amount to a ratification of the unauthorized contract, so as to bind it to continue appropriations to the college, so, as to maintain the college forest and enable it to fulfill such contract; each appropriation having been for a special purpose in the maintenance of the College of Forestry.

[Ed. Note.—For other cases, see States, Dec. Dig. § 102.*]

3. WOODS AND FORESTS (§ 8*)—SALE OF PROPERTY—DUTY OF PURCHASER—KNOWLEDGE OF LIMITATIONS.

A private corporation, contracting with Cornell University for the purchase of property of the State College of Forestry, was bound to know the statutory restrictions upon the power of the University to sell the state's property.

[Ed. Note.—For other cases, see Woods and Forests, Dec. Dig. § 8.*]

4. WOODS AND FORESTS (§ 8*)—SALE OF TIMBER—VALIDITY.

Laws 1898, c. 122, authorized Cornell University to establish a department, known as the State College of Forestry, for the purpose of "instruction in the principles and practices of scientific forestry," and authorized the University trustees to purchase a forest preserve upon which it should conduct experiments in forestry, and might plant, raise, cut, and sell timber in such manner as it deemed best for imparting knowledge concerning the scientific use of forests and the reproduction thereof. The act contemplated that further appropriations would be made to support the college, and section 7, as amended by Laws 1900, c. 301, provided that all sums received from the sale of timber should be deposited to the credit of the University. Held, that the University had no power to contract for the state to sell to a private corporation the timber growing on the college forest preserve for a period of 15 years, especially where the carrying out of the contract would, within that period, practically denude the preserve.

[Ed. Note.—For other cases, see Woods and Forests, Dec. Dig. § 8.*]

Action by the People of the State of New York against the Brooklyn Cooperage Company and Cornell University. Judgment for plaintiff.

See, also, 131 N. Y. Supp. 952.

Edward H. Letchworth, Deputy Atty. Gen., and John G. Agar (James F. Tracey, of counsel), for the People.

John K. Ward, for Forest, Fish and Game Commission.

Shepard, Smith & Harkness, Edward M. Shepard, and D. Cady Herrick (Charles Herrick, of counsel), for defendant Brooklyn Cooperage Company.

Frank Van Cleef (Edward W. Hatch, of counsel), for defendant Cornell University.

CHESTER, J. This action was originally submitted to the late Justice Fitts for determination, but remained undecided at the time of his death. By stipulation it has come to me for decision.

The complaint was demurred to by the defendant Cooperage Company for insufficiency. The demurrer was overruled at Special Term, and the judgment entered thereon was affirmed by the Appellate Division (114 App. Div. 723, 100 N. Y. Supp. 19) and by the Court of Appeals (187 N. Y. 142, 79 N. E. 866). It was thus determined that

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the complaint stated a good cause of action. At the Special Term the contract between the University and the Cooperage Company, which is annexed to and made part of the complaint, was held in an unreported opinion to be void, as not being permissible under the statute (Laws 1898, c. 122), which provided for the establishment of a College of Forestry at Cornell University. Nevertheless the appellate courts seem to have avoided this question, except that in the opinion of the Court of Appeals it is said (187 N. Y. 154, 79 N. E. 870) that:

"There can be no doubt that subdivision third of the contract confers upon the (cooperage) company powers hostile to the general scheme of the act of 1898."

This was the important clause of the contract, and the one which purported to give the company the right to require the University to cut at its own expense, and deliver to the company, in each and every year for 15 years, such quantities of wood in logs and cordwood as it shall give written notice that it shall require during the following season, provided the amount shall not exceed one-fifteenth of the wood standing on the college forest.

The Cooperage Company claims that it has been damaged in a very large amount by reason of the alleged breach by the state and the University of this contract. In its answer it made no demand for affirmative relief as against the University. On the hearing before me I granted a motion, which was pending before Mr. Justice Fitts, which permitted an amendment to such answer. This was granted, as stated by me at the time, for the purpose of enabling the court to frame equitable relief to the plaintiff, if it awarded any, upon such terms and conditions as to damages as justice requires.

[1] But under the amendment authorized no affirmative relief could properly be granted in favor of the Cooperage Company against the University, for the reason that no claim for such relief against the University was made in the original answer, and it was not required, therefore, to litigate any such claim, and for the further reason that the court, upon the trial, could not allow an amendment making a substantial change in the "claim or defense." Code Civ. Proc. § 723. The proposed amendment was not allowed, therefore, for the purpose of bringing in such a "claim or defense," but solely, as above stated, for the purpose of enabling the court to frame equitable relief, if any, to the plaintiff. The amended complaint as interposed, nevertheless, appears to be framed to cover a claim for affirmative relief by way of damages in favor of the Cooperage Company against both the state and the University. From the view I am compelled to take of the case, however, the amendment, whatever its scope or purpose, is unimportant, because I see no way in which any damages can be awarded to the Cooperage Company as against either the plaintiff or the University, as a condition of granting equitable relief or otherwise.

The Court of Appeals held as above mentioned with respect to the third clause of the contract, and stated (187 N. Y. 153, 79 N. E. 870) that:

"The covenant in question is one that might be entered into by the absolute owner of forest property who is desirous of cleaning the same by annual sales of timber."

That court deemed, however, that the situation presented was one—
"where the rights of the parties can only be properly protected by a trial in which all the facts bearing upon the controversy can be elicited and considered." 187 N. Y. 154, 79 N. E. 870."

The trial has been had, but I fail to see that the evidence produced in support of the allegations of the complaint are very materially different from the facts alleged therein, which were admitted for the purpose of the demurrer, or that the evidence of the defendants makes any very substantial change in these facts.  Of course, they are greatly amplified by the evidence, and there is a vast amount of testimony by experts on forestry as to their differing theories or opinions regarding the science of forestry; but the controlling facts were before the Court of Appeals on the demurrer, and the conclusions it reached leave me but little latitude in framing the judgment which must follow the trial.

The third clause of the contract was the one which brought disaster to the whole scheme, for the reason that the expense involved in doing the cutting required exceeded the amount payable under the contract for the timber and wood cut.  The cutting could not, therefore, proceed without annual appropriations by the state.  When these were withheld, the cutting ceased.

After quoting several provisions of the contract, it is stated in the opinion of the Court of Appeals (187 N. Y. 152, 79 N. E. 869) that:

"These recitations and provisions clearly show that the Cooperage Company entered into the contract with full knowledge of the fact that the University represented the state under a restricted agency, and that the entire property involved was the forest under the act of 1898.  A person dealing with an agent whose powers are special and restricted, of which fact he has notice, contracts with him at his peril, and is bound by the provisions of the act of the Legislature or written instrument from which he derives his authority."

The act of 1898 authorized Cornell University to establish a—

"department in said University to be known as and called the New York State College of Forestry for the purpose of education and instruction in the principles and practices of scientific forestry."

The trustees of the University, under the act, were authorized, with the consent and approval and under the direction of the forest preserve board, to purchase not more than 30,000 acres of land in the Adirondack forests, and the act provides that:

"The University shall have the title, possession, management and control of such land, and by its board of trustees through the aforesaid College of Forestry, shall conduct upon such land such experiments in forestry as it may deem most advantageous to the interests of the state and the advancement of the science of forestry, and may plant, raise, cut and sell timber at such times, of such species and quantities and in such manner as it may deem best with a view to obtaining and imparting knowledge concerning the scientific management and use of forests, their regulation and administration, the production, harvesting and reproduction of wood crops and earning a revenue therefrom, and to that end may constitute and appoint a faculty of such school, consisting of one director or professor, and two instructors, and may employ such forest manager, rangers and superintendents, and incur such other expenses in connection therewith as may be necessary for

the proper management and conduct of said college and the care of said lands and for the, purposes of this act, within the amount hereinafter appropriated."

The amount appropriated was $10,000, and the expenditures authorized were thus limited by the amount of the appropriation. It was contemplated that further appropriations would be made, and the act provided that all moneys received by the University from state appropriations for said college shall be kept in a separate fund from the moneys of the University, and shall be used exclusively for said college, and also, in section 7 of the act, that all sums received by the University from the sale of timber or otherwise, under the act, shall be immediately paid to the State Treasurer and credited to the fund appropriated from time to time for the purposes of the act. Before the contract in question was made, however, said section 7 was amended by chapter 301, Laws of 1900, to provide that all sums received from the sale of timber or otherwise, under the act, should be deposited to the credit of the University in such bank or banks as may be designated by the State Comptroller, to be drawn out by the treasurer of the University upon checks countersigned by the Comptroller, and the subsequent reports of the University show that this was done.

Under the act of 1898, 30,000 acres of forest land in Franklin county were purchased and conveyed to the University; but the entire consideration for the conveyance, the sum of $165,000, was paid by the state. Besides the appropriation of $10,000 made by the act of 1898, the Legislature appropriated the same sum annually in 1899, 1900, 1901, and 1902. Chapter 569, Laws 1899; chapter 418, Laws 1900; chapter 644, Laws 1901; chapter 593, Laws 1902. These appropriations were used mainly for the salaries of the director and instructors in the College of Forestry. In addition to these appropriations an appropriation of $30,000 was made by chapter 569, Laws of 1899, and another of $30,000 by chapter 419, Laws of 1900, both known as working capital "for improving, maintaining and administering" the college forest. The regular appropriation of $10,000 was inserted in the appropriation bill of 1903, but this was vetoed by Gov. Odell (Public Papers of Gov. Odell, 1903, p. 102), and thereafter no appropriations for the College of Forestry was made, except one of $5,000, "exclusively for the removal of underbrush and for the replanting of trees." Chapter 599, Laws of 1903. The University shortly thereafter, and in June, 1903, discontinued the College of Forestry and dismissed its director, although for nearly a year thereafter it continued to cut timber on the college forest and deliver the same to the Cooperage Company pursuant to the contract.

All of the moneys appropriated have been applied to the uses for which they were appropriated, except a small balance of about $9,000 of the working capital. The contract referred to was made May 5, 1900, by and in the name of the University, with the defendant Cooperage Company.

[2] The effort here has been to show that the contract, while in form in the name of the University, was in fact and in law that of the state, and, even if void in its inception, which is not conceded, has

been ratified and confirmed by the state, and that the state is therefore liable for its breach. I am unable to bring myself to the conclusion that by making any of these appropriations the state ratified or approved the contract, or that there was any legal obligation on the part of the state to make continuous appropriations for the college, or to maintain the college forest. One Legislature could not bind later ones to make continuous or any appropriations, except for the discharge of legal obligations of the state. Each appropriation made was for a special purpose, defined in the act making it, and was voluntary in character. Each was a new grant of money, not made in fulfillment of a prior legal obligation. When the state was convinced, or without being convinced, that the purposes of the act of 1898 were not being carried out, it had the right to withhold further appropriations.

[3, 4] The contract, which was not in the name of the state, bu' in the name of the University, was made, as held by the Court of Ap peals, under a "restricted agency," and the Cooperage Company knew. or were bound to know, the restrictions upon the powers of the agent, and that as such restricted agent it could only legally act within the powers granted and in furtherance of the purposes of the act of 1898. That conferred no power or authority to the University to incur any obligations of any character in excess of the amount appropriated by the act and outside of such purposes.

The University, it is true, under the law had the power to "cut and sell timber at such times, of such species and quantities and in such manner as it may deem best"; but such power was required to be exercised "with a view to obtaining and imparting knowledge concerning the scientific management and use of forests, their regulation and administration, the production, harvesting and reproduction of wood crops and earning a revenue therefrom," and it was required to conduct "such experiments in forestry as it may deem most advantageous to the interests of the state and the advancement of the science of forestry." The prime purpose of the act, and it was so stated in the title, was "to promote education in forestry." Everything in the law, and all the powers therein conferred, were aimed to accomplish that purpose. The law confers no power upon the University to bind the state for a period of 15 years, or to bind it to cut and remove one-fifteenth of the wood and timber standing on the college forest in each year during that time, and especially not under a contract which would have the effect, if executed, of completely defeating the purposes of the act.

In providing for clearing the entire tract in 15 years the University was deprived to a large extent of the power of experimental forestry, which was one of the purposes of the act. It is evident that one of the purposes of the Legislature in authorizing the sale of timber and wood was to render the college self-supporting by earning a revenue therefrom. Under the contract there could be no net revenues, as the expenses exceeded the income. The Cooperage Company suffered no loss because of the increased cost of labor and supplies, and received all the benefit of the increased and increasing price of lumber. The cutting and selling under such conditions were not and could not

be conducted at a profit, but were conducted at considerable and increasing loss. The contract, therefore, was the means whereby this purpose was completely defeated.

Neither the term or duration of the proposed contract nor the prices to be received thereunder for the wood and timber to be delivered were reported to the state prior to its execution in any of the official reports required by law to be made by the University. Not until its third annual report, dated January 15, 1901, were the full terms and duration of the contract made known to the Legislature. The fact that the Legislature thereafter made an appropriation for a defined purpose—that is, for maintenance of the College of Forestry—did not in my opinion amount to an affirmance and ratification of a contract which was made outside and in excess of the lawful powers of the University under its restricted agency, of which the Cooperage Company was bound to take notice.

About 3,100 acres of the college forest were cleared of their timber during the comparatively brief time the college was in operation; but only about 440 of these were replanted. At this rate, if the contract was to be executed, a very considerable portion of the college forest would be practically denuded of its trees during the life of the contract for the benefit of a private industry, and not for the promotion of education in forestry. While there is a constitutional prohibition against cutting timber from lands comprised in the forest preserve, there is no such prohibition against planting trees thereon. In the preserve there are many thousand acres of land which before the title came to the state were denuded of their forests. It could hardly be deemed wise on the part of the state, nor in the interests of scientific forestry and the promotion of education therein, to permit, under the contract in question, the denudation of practically the entire college forest, unless the law clearly authorizes a contract, which can work such a result, and it seems to me for the reasons stated that it does not. There is proof in the case that 500 acres were sufficient for conducting experiments on the "clear cutting" system of forestry, as distinguished from the "selection system."

The replanting of a cleared forest is a matter of large expense. If the contract was to be complied with, the revenues from the sale of the logs and wood, after paying the expense involved in cutting and delivering them, would leave an annual deficit, and, of course, nothing to cover the expense of replanting. The contract, therefore, was the means of defeating this purpose, which was one of the prime essentials of the entire scheme. It would result in a denuded territory, and not a reforested one. This important work of reforestation could not be performed, if this contract is to be enforced, unless the state provide large and continuous appropriations, which, as I view the matter, it was under no legal obligations to make.

The title to the lands having been committed by the state to the University for a specific purpose, and that purpose having failed, it should be conveyed to the state now, rather than to await the termination of 30 years, when under the law it was to revert to the state, es-

pecially as the University has expressed a willingness to acquiesce in such a result, if it should be so adjudged by the court.

I think that the plaintiff is entitled to judgment declaring the contract to be void, and directing a conveyance to it of the lands in question by the University, with costs against the defendant Cooperage Company.